# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2124

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CLEO C. ROSS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 20042—**Michael P. McCuskey**, *Chief Judge.*

———————

ARGUED MAY 9, 2005—DECIDED JUNE 20, 2005

———————

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Cases involving felons charged with possessing firearms are generally pretty mundane. In the typical case, a felon, with a gun in his car, is stopped for a traffic violation. If the evidence isn't suppressed, the inevitable conditional guilty plea follows, with the search issue reserved for appellate review. Unlike the typical case, our case today, at least the factual situation from which it springs, is anything but mundane. Here are the facts.

Cleo Ross was in jail in the summer of 2000 when he began corresponding with Wynemia Lindsey, a legal secre-

tary in the State's Attorney's office in Champaign County, Illinois. Lindsey was the mother of one of Ross's childhood friends and he got to know her when she hosted neighborhood cookouts back in the late 1980s and early 1990s. Despite their 14-year age gap, romance blossomed. When Ross left jail on parole in February of 2001, he moved in with Lindsey. Sometime that summer, Ross allegedly showed Lindsey a shotgun he had stashed behind the furnace in her basement. He explained that he wanted to keep the firearm with her because, as a convicted felon, he could not possess it himself. Lindsey later moved the shotgun into her bedroom. The June-November romance[1] between Ross and Lindsey hit the skids in early 2002.

In August of 2002, Lindsey began dating another man, Jesse Ratliffe. Lindsey testified at trial that in the early morning of September 8, 2002, Ross showed up at her home unannounced and armed with a handgun. He found Lindsey in bed with Ratliffe. The two men began to wrestle and a gun went off, wounding Ratliffe in the hand. Both men then fled, apparently in different directions. The police later recovered Ross's shotgun from Lindsey's house but were unable to find the gun used in the shooting. Also, Lindsey's story had a few holes. For one thing, it differed from her original account, where she fingered an imaginary exboyfriend as the culprit. And though Ratliffe's testimony corroborated Lindsey's in some respects, he could not identify Ross as the perpetrator. Moreover, Ratliffe said the perpetrator was around 6'0"; Ross, however, is closer to 6'7".

Ross filed two motions on the eve of trial. First, he sought to introduce the results of a private polygraph test taken by him 2 weeks earlier. Incredibly, the polygraph report purported to establish that Ross placed the shotgun in

---

[1] A 14-year age spread is too short to qualify as a traditional May-December romance.

Lindsey's home in 1991 and had forgotten it was there. If credited, this report could have torpedoed the government's case. First, it would time-stamp the crime roughly 10 years prior to the time identified by Lindsey; notably, outside the 5-year statute of limitations. And it also would cast doubt on whether Ross was a convicted felon when he possessed the gun. After reviewing the polygraph report *in camera*, the district court refused to admit it, concluding that its prejudicial impact far outweighed its probative value under Federal Rule of Evidence 403. The court also noted that allowing an expert to vouch for the test results "would be turning over the function of the jury to a polygraph examiner." Ross also filed a motion *in limine* seeking to preclude the government from impeaching him with his prior convictions for home invasion and armed robbery. The court denied that request as well.

Trial commenced in early 2003. The defense's theory was that Lindsey shot Ratliffe and then tried to pin it on Ross. As for the shotgun, which had his fingerprints on it, Ross argued that he possessed it many years ago. The jury found Ross guilty of violating 18 U.S.C. § 922(g)(1). He was sentenced to a term of 115 months.

Ross raises three challenges to his conviction. First, he argues that the district court erred in excluding the polygraph results. "A district court's decision on the admissibility of polygraph results deserves considerable deference, and will be reversed only when the district court has abused its discretion." *United States v. Lea*, 249 F.3d 632, 638 (7th Cir. 2001) (citing *United States v. Olson*, 978 F.2d 1472, 1480 (7th Cir. 1992)). In assessing the admissibility of such evidence, a court must balance its probative value and prejudicial effect, and the risk of issue confusion, misleading the jury, and undue delay. *Id.* The court should therefore "take as its guide Rule 403 of the Federal Rules of Evidence[.]" *United States v. Robbins*, 197 F.3d 829, 844 (7th Cir. 1999).

Ross has failed to establish an abuse of discretion. His primary argument is that the district court applied the wrong legal standard, mistakenly relying on Illinois law, which prohibits polygraph evidence all together. But the district court did no such thing. True, Judge McCuskey did say that he was familiar with Illinois's blanket prohibition because he was a former state judge. But he also recognized that there is no similar ban in federal court and then proceeded to analyze the admissibility question under Rule 403 and the expert witness test enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court therefore applied the correct legal standard.

There was no abuse of discretion here because, for one thing, the manner in which the test was administered—privately commissioned, in the eleventh hour, and without notice to the government—was highly suspect. Not surprisingly, Ross fails to identify another case where polygraph evidence was admitted in similar circumstances. Indeed, courts have routinely rejected unilateral and clandestine polygraph examinations like the one taken here, citing concern that a test taken without the government's knowledge is unreliable because it carries no negative consequences, and probably won't see the light of day if a defendant flunks. *See United States v. Tucker*, 773 F.2d 136, 141 (7th Cir. 1985); *United States v. Williams*, 737 F.2d 594, 611 (7th Cir. 1984); *United States v. Feldman*, 711 F.2d 758, 767 (7th Cir. 1983); *United States v. Thomas*, 167 F.3d 299, 309 (6th Cir. 1999); *United States v. Sherlin*, 67 F.3d 1208, 1217 (6th Cir. 1995); *United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir. 1984).

Next, Ross argues that the district court erred by refusing to bar the government from introducing evidence of his prior felony convictions, for impeachment purposes, in the event he testified. But by choosing not to testify during his trial, Ross waived appellate review of this issue. *Luce v.*

*United States*, 469 U.S. 38, 43 (1984); *United States v. Fallon*, 348 F.3d 248, 254 (7th Cir. 2003).

Ross raises one other challenge to his conviction, one that is before us in a rather unusual "here today, gone tomorrow" fashion. Unlike his other issues, this one has traction. The indictment charged Ross with being a felon who possessed a firearm "on or about September 8, 2002." The jury was instructed, however, in accordance with the evidence presented at trial—which cast some doubt on the government's claim that Ross possessed a firearm at any time close to the date in the indictment—that it could still convict as long as Ross possessed the weapon "on or after May 22, 1998." The instruction was given to meet a possible statute of limitations defense that if Ross possessed the gun, he did so years earlier than the date charged in the indictment. This change allowed the jury to find Ross guilty if it believed he possessed the shotgun in the summer of 2001 (when he allegedly showed it to Lindsey) as opposed to possessing "a firearm" on or about September 8, 2002, when the Lindsey/Ratliffe tryst was rudely interrupted. Although the evidence, and hence jury instructions, in a criminal trial are permitted to vary somewhat from the allegations of the indictment, in recognition of the inherent uncertainties of the trial process, there are limits to any permitted variance. *United States v. Jefferson*, 334 F.3d 670, 673 (7th Cir. 2003); *United States v. Trennell*, 290 F.3d 881, 887-88 (7th Cir. 2002); *United States v. Milstein*, 401 F.3d 53, 65 (2nd Cir. 2005); *United States v. Floresca*, 38 F.3d 706, 710-11 (4th Cir. 1994) (en banc). Otherwise the Fifth Amendment right of a defendant not to be prosecuted unless a grand jury determines that there is probable cause to prosecute him for the crime for which he is to be tried could be easily circumvented. *Stirone v. United States*, 361 U.S. 212, 216 (1960); *United States v. Folks*, 236 F.3d 384, 390 (7th Cir. 2001); *United States v. Field*, 875 F.2d 130, 133 (7th Cir. 1989). Realistically, federal grand juries today provide little

protection for criminal suspects whom a U.S. Attorney wishes to indict. Nevertheless, that is not a realism to which judges are permitted to yield.

The government tells us that the phrase "on or about" a specified date allows the prosecutor at trial to reach back to the beginning of the statutory period of limitations, which here is 5 years. Although dicta can be quoted to that effect, *e.g.*, *Ledbetter v. United States*, 170 U.S. 606, 612-13 (1898); *United States v. Leibowitz*, 857 F.2d 373, 378 (7th Cir. 1988); *United States v. Krepper*, 159 F.2d 958, 964 (3rd Cir. 1946), we've found no cases that hold that a huge discrepancy, like 4 years here, is permissible. The canonical formula is that "when 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established." *United States v. Ford*, 872 F.2d 1231, 1236-37 (6th Cir. 1989); *see*, *e.g.*, *United States v. Castillo*, 140 F.3d 874, 885 (10th Cir. 1998); *United States v. Nersesian*, 824 F.2d 1294, 1323 (2nd Cir. 1987). Four years isn't "reasonably near." *United States v. Hinton*, 222 F.3d 664, 672-73 (9th Cir. 2000), cites two cases, involving 2-year and 7-month discrepancies respectively, to illustrate unreasonable departures from charging language in an indictment.

There might, we suppose, be cases where it was obvious to the grand jury that the criminal conduct that it was asked to charge the defendant with began years before the "on or about" date in the indictment, and then it might be argued that the variance, while startling, was not fatal. But this case is at the opposite end of that spectrum. It is clear from the "on or about" date alleged here that the grand jury probably thought it was indicting Ross for possessing a pistol when the Llindsey/Ratliffe tryst was interrupted. The instructions, however, permitted the jury to convict him for possessing a shotgun 4 years earlier. Had the instructions limited the jury's consideration to the later incident, Ross might well have been acquitted.

So Ross has a strong argument, one his lawyer argued about in her opening brief. But then, bizarrely, in the opening sentence of her reply brief, the lawyer wrote, without further elaboration:   "After reviewing the brief for the Plaintiff-Appellee [i.e., the government], the defendant concedes this issue." Essentially, she threw away a winning argument—"Here today, gone tomorrow." But after oral argument, counsel realized she made a mistake and sent a letter asking to withdraw the concession made in her reply brief. We are unaware of any authority for making such a retraction (she cites none), but then again, the government can't claim prejudice, as defense counsel did not have to make the concession or even file a reply brief. *See* Fed. R. App. P. 28(c); 16A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3974.3, pp. 525, 530 (3d ed. 1999); Jason Vail, "The Pitfalls of Replies," 2 *J. App. Prac. & Process* 213-14, 216 (2000); *compare United States v. Rodriguez*, 15 F.3d 408, 415 n.7 (5th Cir. 1994). Given the situation here, we will allow the retraction and find for Ross on the resurrected issue we just discussed.

Accordingly, we VACATE Ross's conviction and sentence and REMAND the case to the district court for a new trial.

A true Copy:

      Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*